**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DANA ROWE,

               Plaintiff,

    v.

NUTRACLICK INTERNATIONAL
LLC; and
PEAK LIFE LLC,

               Defendants.

Case No. 15-cv-13445

**CLASS ACTION COMPLAINT FOR BREACH OF EXPRESS
WARRANTY, BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY, BREACH OF CONTRACT, BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD,
NEGLIGENT MISREPRESENTATION, UNJUST ENRICHMENT, AND
VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT**

**Introduction**

Defendants engage in false, unfair and deceptive practices in advertising, marketing and selling their Somnapure sleep aid supplement to consumers. In particular, Defendants falsely represent to consumers that Somnapure is "natural," "all natural" and that it contains "all natural ingredients." In fact, Somnapure contains numerous non-natural ingredients, some of which are known to be harmful.

In addition, Defendants designed their website to dupe consumers into signing up for a subscription program with recurring charges, referred to by the Federal Trade Commission as "negative option billing" or "a negative option plan." Defendants represent that consumers are signing up to receive a "free sample" of Somnapure, and that they need to provide their payment information to "pay only shipping and handling." Instead, Defendants use the payment information to bill customers on a recurring basis for more product. Defendants' conduct violates not only state and federal consumer protection laws, but also this Court's injunction in *Manna v. Hungry Fish Media LLC*, Case No. 3:2013-cv-30166-MAD, which requires Defendants to "clearly and conspicuously inform all consumers of all material terms and conditions associated with the Subscription Program," and to do so "at the time a consumer enrolls into a Subscription Program."

**The Parties**

1.      Plaintiff Dana Rowe is an individual residing in Panama City, Florida.

2.      Defendant NutraClick International LLC, formerly known as Hungry Fish Media LLC, is a limited liability company organized under the laws of

Delaware, with its principal place of business at 24 School Street, Suite 401, Boston, Massachusetts 02108.

3.     Defendant Peak Life LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 24 School Street, Suite 401, Boston, Massachusetts 02108. Peak Life is a wholly-owned subsidiary of NutraClick.

**Jurisdiction and Venue**

4.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), and diversity of citizenship, 28 U.S.C. § 1332(a). On information and belief, the number of members of the Class is at least 100, and the aggregated amount in controversy for Plaintiff and the Class is in excess of $5 million.

5.     In addition, this Court has jurisdiction over the subject matter of this action, and venue is proper in this district, pursuant to the Court's March 24, 2014 Final Approval Order in *Manna v. Hungry Fish Media LLC*, Case No. 3:2013-cv-30166-MAD, which states that "the court reserves continuing and exclusive jurisdiction over the parties to the Settlement Agreement with respect to implementation and enforcement of the terms of the Settlement Agreement and the orders of the court for the mutual benefit of the Parties." (Dkt. No. 32 at 5.)

6.     This Court also has subject matter jurisdiction over Plaintiff's claims under the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*. *See* 28 U.S.C. § 1331.

7.     Venue is additionally proper in this district pursuant to 28 U.S.C. §§ 1391(a), (b) and/or (c), because the acts and transactions giving rise to the violations of law complained of herein occurred in this district and Defendants (i) have their corporate headquarters and principal place of business in this District;

(ii) conduct business themselves or through their agent(s) in this district; and/or

(iii) are licensed or registered to do business in this district.

<div align="center">**Facts**</div>

**I.     Defendants Falsely and Deceptively Represented to Plaintiff and Similarly Situated Consumers that Somnapure is a "Natural" Supplement.**

8.     Defendants advertise, market, and sell their Somnapure[1] "Natural Sleep Aid" supplement to consumers through various outlets, including brick-and-mortar retailers such as Wal-Mart, Walgreens, and CVS; and Defendants' own website, www.peaklife.com (the "Peak Life Website"). As described in more detail below, in each instance, Defendants deceptively advertise, market, and sell Somnapure as being a "natural" and "all natural" product, and fail to adequately disclose that it, in fact, contains synthetic, non-natural ingredients.

**A. "Natural" Representations Made to Consumers Purchasing Somnapure in a Store**

9.     On the front of the Somnapure packaging, Defendants represent that Somnapure is a "Natural Sleep Aid":

---

[1] As used in this Complaint, "Somnapure" shall refer to Defendants' Somnapure product, and shall not refer to the products known as "Somnapure PM" or "Somnapure Clinical Strength."



10.    The packaging also states that "you can rest easy knowing that you are getting the very best from an all-natural product":

possible. With Peak Life®, you can rest easy knowing that you are getting the very best from an all-natural product.

11.    One side of the packaging states that Somnapure contains "Real Ingredients," which are "premium, natural ingredients that are already familiar to you." These "Real Ingredients" are identified as being lemon balm, hops, chamomile flower, passion flower, melatonin, valerian, and L-thenine:



12.   The other side of the package contains a box entitled "Supplement Facts," which lists only Somnapure's natural ingredients:



**B.  "Natural" Representations Made to Consumers Utilizing the Peak Life Website's "Purchase" Option**

13.   The Peak Life Website repeatedly represents that Somnpure is a "natural" and "all-natural" product. The primary "Product Information" webpage on the website contains a photograph of a Somnapure bottle containing the words "Natural Sleep Aid":



(https://www.peaklife.com/products/somnapure)

14.   The Product Information Page also refers to "Somnapure's naturally occurring ingredients":

quickly, maintain high-quality sleep, and allows you to wake up feeling refreshed. Giving you peace of mind, Somnapure's naturally occurring ingredients are non-habit forming and won't leave you feeling groggy the next day.

(*Id.*)

15.   The Somnapure Product Information webpage also prompts consumers to click on a link to "View the ingredients of Somnapure." (*Id.*) That link leads to a another webpage entitled "Somnapure—the all-natural sleep solution." (http://www.somnapure.com/formula). That webpage invites consumers to "Get to Sleep Naturally, and refers to Somnapure as being a "natural sleep aid" with "naturally occurring ingredients." (*Id.*) The webpage also contains a photograph of the Somnapure packaging and bottle, representing that Somnapure is a "Natural Sleep Aid":



**Get To Sleep Naturally.**

## Somnapure® – the all-natural sleep solution

Many of us struggle to get the proper amount of exercise, nutrition, and sleep that we need to live life at our peak. Between busy schedules, deadlines, and long hours, our health often comes last. That's why we have developed a scientifically formulated natural sleep aid just for you.

Most sleep aids only focus on one aspect of your sleep. Our ground-breaking formula addresses all three aspects of great sleep. Somnapure helps you fall asleep quickly, maintain high-quality sleep, and allows you to wake up feeling refreshed. Giving you peace of mind, Somnapure's naturally occurring ingredients are non-habit forming and won't leave you feeling groggy the next day.



(*Id.*)

16.    The webpage lists the ingredients of Somnapure as being melatonin, L-theanine, valerian extract, hops extract, lemon balm, chamomile flower, and passion flower:

## Ingredients



### Melatonin

Melatonin is a natural hormone produced by your body. Melatonin plays an important role in regulating your sleep cycle, helping you return to a healthy sleep routine. Melatonin levels in your body tend to decrease as you age.



### L-Theanine

L-Theanine Is an amino acid (a building block of protein) that is commonly found in herbal teas. L-Theanine exhibits a relaxing effect on the mind by increasing alpha-wave activity. Relaxing is an essential part of falling asleep.



### Valerian Extract

Is a perennial herb that has been used for centuries to promote relaxation and sleep. Valerian is thought to help improve the amount of time it takes to fall asleep and the quality of sleep.



### Hops Extract

Research suggests that the combination of hops and valerian help increase alpha-waves. This then helps to reduce the amount of time it takes to fall asleep and improves the quality of sleep. The popular folk remedy for sleeplessness is a "pillow filled with hops."



**Lemon Balm**

Is also a perennial herb in the mint family that has been used for centuries to promote relaxation and sleep. Early research suggests that lemon balm promotes a calm and relaxed state of mind, an important part of falling asleep.



**Chamomile Flower**

Is a daisy-like flower that is well known for its calming effects and use in herbal teas. It is traditionally used to promote calmness and sleep.



**Passion Flower**

Is a truly beautiful flower that is also well known for its calming effects apart from its vibrant colors and unique appearance. Passion flower is traditionally used to promote sleep.

(*Id.*)

17.   The primary Somnapure "Product Information" webpage also contains a link entitled "Supplement Facts." The link leads to a webpage that contains another photograph of a Somnapure bottle with "Natural Sleep Aid" printed across the label, as well as a "Supplement Facts" label that again deceptively discloses only the natural ingredients of Somnapure:



(https://www.peaklife.com/products/somnapure#tab-3).

18.   It is impossible to purchase Somnapure using the Peak Life Website without seeing at least the primary Somnapure "Product Information" webpage discussed above.

**C. "Natural" Representations Made to Consumers Utilizing the Peak Life Website's "Sample" Option**

19.   Through the Peak Life Website, Defendants also enable consumers to obtain a sample of Somnapure. To obtain a sample, consumers must view a webpage containing basic information about Somnapure. That webpage repeatedly represents that Somnapure is an "all natural" product with "all natural ingredients":



(http://www.peaklife.com/lg/703/pid=200)



(*Id.*)



(*Id.*)

20.   The webpage also shows a photograph of the front of the Somnapure packaging and bottle, which each contain the representation "Natural Sleep Aid":



(*Id.*)

21.   The webpage also prompts consumers to complete a form in order to provide their first name, gender, age, and zip code to "see if you qualify" for the sample.

**D. Somnapure is Not a Natural or All Natural Product.**

22.   Contrary to Defendants' representations, Somnapure is not a "natural" or "all natural" product. Instead, it contains a number of synthetic, non-natural ingredients, including at least dicalcium phosphate, hypromellose, maltodextrin, and polyethylene glycol.

23.   Dicalcium phosphate is a synthetic compound and a phosphate salt. It can be used as a flow agent in pharmaceutical preparations. The National Institute of Health reports that certain persons—including those with heart, liver, or kidney disease, cirrhosis, hypercalcemia, Addison's disease, or thyroid problems— should avoid it and other phosphate salts, or should use it only with the advice and ongoing care of a healthcare professional. (*See* https://www.nlm.nih.gov/medlineplus/druginfo/natural/735.html.)

24.   Hypromellose is a synthetic polymer used as an emulsifier and thickening and suspending agent. It is used in tile adhesives, cement renders,

gypsum products, detergents and cleaners, and paints. (*See* https://en.wikipedia.org/wiki/Hypromellose.)

25.   Polyethylene glycol is a synthetic petroleum-based polyether compound. It has numerous industrial applications, including as an excipient for pharmaceuticals. Polyethylene glycol can be used as a laxative, and can cause side effects such as nausea, bloating, cramping, gas, and diarrhea. (*See* https://www.nlm.nih.gov/medlineplus/druginfo/meds/a603032.html.)

26.   Maltodextrin is a synthetic compound, typically made from processing starch using heat and enzymes to reduce it to a white powder. Studies have linked consumption of maltodextrin to the suppression of beneficial bacteria in the digestive system, potentially putting consumers at risk of bacterial infections such as salmonella or E.coli. (*See* Nickerson KP, McDonald C (2012) *Crohn's Disease-Associated Adherent-Invasive Escherichia coli Adhesion Is Enhanced by Exposure to the Ubiquitous Dietary Polysaccharide Maltodextrin*. PLoS ONE 7(12): e52132. doi:10.1371/journal.pone.0052132; Nickerson KP, Homer CR, Kessler SP, Dixon LJ, Kabi A, et al. (2014) *The Dietary Polysaccharide Maltodextrin Promotes Salmonella Survival and Mucosal Colonization in Mice*. PLoS ONE 9(7): e101789. doi:10.1371/journal.pone.0101789.) Maltodextrin is also a carbohydrate, and can negatively affect blood sugar levels, especially for persons with diabetes.

27.   Defendants- do not disclose to consumers that any ingredients of Somnapure are synthetic and/or non-natural. The Somnapure package contains a list of "Other ingredients," which appears in fine print and on the side of the package. The non-natural ingredients are included in that list, but there is no disclosure that the ingredients are non-natural. The Somnapure website does not even disclose the list of the non-natural ingredients to consumers, nor does it disclose that Somnapure contains anything other than natural ingredients.

### E. Defendants' False and Deceptive Representations Enable them to Charge a Premium for Somnapure.

28.   Defendants' false and deceptive representations that Somnapure is a "natural" and "all natural" product enable them to charge more for Somnapure than they would be able to charge if they did not make those false representations.

29.   Defendants sell another non-natural formulation of Somnapure, called "Somnapure Clinical Strength." Defendants do not market Somnapure Clinical Strength as being "natural" or "all natural." Accordingly, Defendants cannot charge as much for Somnapure Clinical Strength as they do for Somnapure. On the Peak Life Website, a 30-day supply of Somnapure costs $29.99. In contrast, a 30-day supply of Somnapure Clinical Strength costs only $14.99, despite the fact that the product's name implies that it is stronger and more effective than Somnapure.

30.   Independent studies show that price premiums are associated with products represented to be "natural" or "all natural." One study of various labeling claims across a variety of food products found that consumers are willing to pay more for products labeled "natural," with premiums ranging from 1% to over 15%. (*See* E. Gubisch, *Do 'natural' claims cut the mustard?*, Leatherhead Food Research, 2013.) Another study showed that products labeled "all natural" or "natural" enjoy price premiums similar to those labeled "organic." *See* J. Anstine, *Organic and All Natural: Do Consumers Know the Difference?*, Journal of Applied Economics and Policy 26.1:15-27 (2007).

II. **Defendants' Campaign to Trick Consumers into Signing up for a Subscription Program with a Recurring Fee, in Violation of a Settlement Agreement and Court Order**

   A. **Defendants' Deceptive Representations to Plaintiff and Other Consumers Regarding the Subscription Program.**

31.   To obtain a sample of Somnapure using the Peak Life Website, consumers must complete three steps. First, as described above, consumers must view a webpage containing basic information about Somnapure. The webpage states that "14 day samples are now available":



(http://www.peaklife.com/lg/703/pid=200.)

32.   Second, consumers must view a webpage asking "Where should we send your sample?" Consumers must then provide their first and last name, address, city, state, zip code, phone number, and email. Consumers are then shown the following button and representation that they are claiming a "FREE SAMPLE" and that they will "PAY ONLY SHIPPING AND HANDLING":

33.   In the third step of obtaining a sample of Somnapure, consumers are prompted to enter their credit card or debit card information. The webpage is

designed to further trick consumers into believing that they are giving Defendants their payment information only for the purpose of paying the shipping and handling associated with the "free" sample. For instance, the following representation appears at the top of the webpage:

<p style="text-align:center; color:green; font-size:large;">You're Almost Done, <u>Dana</u>, Pay For S & H Below</p>

34. In addition, the webpage includes a box containing a form for the credit card / debit card information, and the box is entitled "Shipping & Handling." Further, the webpage contains a breakdown of price wherein the "Total" includes *only* shipping and handling, and sales tax:

|  |  |
|---:|---|
| Subtotal: | $0.00 |
| S&H: | $2.99 |
| Sales Tax: | $0.22 |
| **Total:** | **$3.21** |

**B. Defendants' Practices Regarding the Display of their Terms and Conditions Violate this Court's Injunction in the Prior Class Action Lawsuit**

35. The final webpage of the Somnapure checkout process on the Peak Life Website also contains very small print Terms and Conditions regarding the Somnapure subscription program. These Terms and Conditions reveal, for the first time, that in 18 days the consumer will be enrolled in a "Somnapure VIP Membership program," whereby the consumer will be billed $29.99 plus $4.99 in shipping in handling every 30 days, unless the consumer calls to cancel within 18 days (the "Subscription Program"). (*Id.*)

36.   The manner in which Defendants display the Terms and Conditions for the Subscription Program is designed to deceive consumers. First, the Terms are hidden at the bottom left corner of the screen, while the consumer is drawn to the right side of the screen to complete a web form to complete payment for "Shipping and Handling." Second, the Terms are in a font that is much smaller than any other font used throughout the checkout process. Third, the Terms are displayed in a lighter font than the other text on the webpage. Fourth, the Terms are displayed as a ".png" image rather than a rendered font. This prevents consumers' browsers from rendering the text, which ensures that (i) the Terms are less legible than the other text on the webpage, and are less legible than they would have been had Defendants used a rendered font; (ii) the Terms are barely legible or completely illegible when a consumer prints the webpage, because the consumer's printer must print an image rather than rendering the text; (iii) the size of the text will remain small, even when users—especially users with visual impairments—attempt to increase the font size of the entire webpage; and (iv) users cannot select the text to copy and paste the Terms into another program for better viewing. Fifth, the placement of the Terms on the webpage relative to the payment form is designed to ensure that the Terms will not be visible to users with smaller screens (such as smart phones) as they are filling out the payment form. Sixth, there is no statement within the web form where consumers input their credit card, such as "I agree to the terms and conditions," nor any other visual cue that might prompt users to focus on the small print.  Seventh, there is no checkbox for users to click indicating that that they have read any terms, or that they are agreeing to a recurring subscription.

37.   After users submit their payment information, the Peak Life Website enables users to view a receipt webpage, which does not mention the Subscription Program. Instead, the receipt webpage merely lists the "Grand Total" as being the

price for Shipping and Handling, and Tax. The webpage also encourages consumers to "Share the Secret!" by emailing friends and family to encourage them to receive "their free samples of Somnapure."

38.    Defendants also send consumers an email to confirm their order. The email does not mention the Subscription Program. It does, however, encourage users to email their friends and family about how they can get "their own FREE sample of Somnapure!"

39.    The manner in which Defendants enroll users into the Subscription Program, as discussed in paragraphs 31 through 38, violates basic principles of web usability.   Among other things, it lacks both a clear pre-purchase commitment screen and a clear post-purchase confirmation screen, and intentionally misdirects consumers into thinking that they are merely ordering a free sample and agreeing to pay for shipping and handling. Defendants intentionally violated these principles to minimize the odds that consumers would notice, read or understand the Terms and Conditions.

40.    On October 2, 2013, a class action complaint was filed in this Court against Defendants and other related companies.[2] (*See Manna v. Hungry Fish Media LLC*, Case No. 3:2013-cv-30166-MAD, Dkt. No. 1.) The plaintiffs alleged that Defendants had wrongfully enrolled them in a "Free-To-Pay" conversion, whereby the plaintiffs signed up for a "free" sample of Somnapure and were then enrolled in a subscription program with recurring charges. The plaintiffs accused Defendants of "failing to disclose to consumers, such as Plaintiffs and the Class,

---

[2] NutraClick was a defendant in *Manna*, although at the time it was called Hungry Fish Media LLC. Peak Life was also a defendant in *Manna*. The other defendants were subsidiaries and/or affiliates of NutraClick and/or Peak Life who advertised, and continue to advertise, products like Somnapure using highly misleading methods. For example, Defendants, typically acting through their subsidiaries, create fake review websites that give their products positive reviews and that contain links to their websites.

all material terms of the "Free-To-Pay" conversion in a ***clear and conspicuous*** manner," and of "failing to ***clearly and conspicuously*** disclose to consumers, such as Plaintiffs and the Class, all material terms of the transactions before obtaining their billing information." (*Id.* at 2 (emphasis added).)

41.   The lawsuit ultimately settled. As part of the Settlement Agreement, Defendants agreed to the following injunction:

> Defendants shall, at the time a consumer enrolls into a Subscription Program, ***clearly and conspicuously*** inform all consumers of all material terms and conditions associated with the Subscription Program. … Defendants satisfy the obligation set forth in this provision by including appropriate disclosures immediately adjacent to where the consumer submits the consumer's payment information for the purchase of one or more of Defendants' Products

(*Manna*, Dkt. No. 23 at 14 (emphasis added).) (the "Injunction")

42.   During the November 19, 2013 hearing regarding preliminary approval of the class action settlement, the Court asked counsel for Defendants whether they had already changed their practices and implemented the requirements of the Injunction.[3] Defendants' counsel stated that the companies had changed their practices and had complied with the terms of the Injunction as of March 14, 2013. (Ex. A at 40:11-43:4.)

43.   Based on the transcripts of the preliminary and final approval hearings, it appears that the Court did not independently verify Defendants' assertion that they had changed their practices, nor did the Court review any images or text of

---

[3] At the time of the hearing, the Court discussed the original Settlement Agreement, which had been filed with the Court on November 1, 2013. (*See Manna*, Dkt. No. 9.) That original Settlement Agreement contained the same Injunction as the one that appears in the Amended Settlement Agreement that was adopted by the Court in its Final Approval Order. (*See Manna*, Dkt. Nos. 23 and 32.)

the purportedly revised Peak Life Website. Instead, the Court stated that "I'[ll] take him [i.e., Defendants' counsel] at his word ...." (*Id.* at 43:7.)

44.   The Court approved the Settlement Agreement, including the terms of the Injunction, and issued its Final Approval Order on March 25, 2014. (*See Manna*, Dkt. No. 32.)

45.   On information and belief, Defendants have never complied with the terms of the Settlement Agreement or Injunction. In fact, to this day—nearly eighteen months after the issuance of the Injunction—Defendants violate the Settlement Agreement and Injunction on a daily basis in multiple ways.

46.   First, Defendants violate the Settlement Agreement and Injunction by failing to include the appropriate disclosures "at the time a consumer enrolls into a Subscription Program." Consumers are enrolled into the Subscription Program 18 days *after* they visit the Peak Life Website and are shown the Terms and Conditions. Specifically, Defendants' Terms and Conditions state that "If you do not call us ... to cancel within 18 days of ordering your free sample ... you ***will be enrolled*** in our Somnapure VIP membership program." (emphasis added). Defendants do not provide *any* disclosures to consumers at the time they are enrolled in the Subscription Program 18 days later. Instead, Defendants simply enroll consumers in the Subscription Program, and charge their credit or debit cards, automatically at that time.

47.   Second, Defendants violates the terms of the Settlement Agreement and Injunction by failing to "***conspicuously*** inform all consumers of all material terms and conditions associated with the Subscription Program." In fact, as described above, Defendants have taken steps to ensure that the terms and conditions are displayed ***inconspicuously*** so that consumers will not notice them. (*See supra*, ¶¶ 31–39.)

48.   Third, Defendants do not "*clearly* … inform all consumers of all material terms and conditions associated with the Subscription Program," as required by the Settlement Agreement and Injunction. In fact, Defendants take steps to ensure that the terms are unclear. In particular, during the checkout process, Defendants inform consumers that they are signing up for a "FREE SAMPLE, PAY ONLY SHIPPING AND HANDLING." (*See supra*, ¶ 32.) In addition, on the webpage on which Defendants collect consumers' payment information, Defendants repeatedly imply that consumers are *only* paying for shipping and handling. At the top of the webpage, text in a large font states "Pay For S & H Below." (*See supra*, ¶ 33.) The webpage also includes a box entitled "Shipping & Handling" containing a form for payment information. Further, the webpage contains a breakdown of price that includes "S&H" for "$2.99," and states that the "Total" is "$2.99." (*See supra*, ¶ 34.) These statements, and the manner in which they were displayed, strongly imply to consumers that they are providing their payment information to pay for shipping and handling only, when in fact the payment information is actually used to charge consumers on a recurring basis.

49.   Defendants also do not satisfy the clause of the Settlement Agreement and Injunction stating that Defendants satisfy the terms of the Injunction by including "including *appropriate disclosures* immediately adjacent to where the consumer submits the consumer's payment information for the purchase of one or more of Defendants' Products." Under any reasonable interpretation of the Injunction, the disclosures cannot be "appropriate" unless they inform consumers (i) "clearly"; (ii) "conspicuously"; and (iii) "at the time a consumer enrolls into a Subscription Program." Any other reading of the injunction would be incorrect, as it would render the "clearly," "conspicuously," and "at the time" requirements superfluous. In addition, Defendants do *not* show consumers *any* disclosures

when they submit their payment information "for the **purchase** of one or more of **Defendants' Products**." Consumers who provide their payment information are doing so to pay for only shipping and handling, not to "purchase" any of "Defendants' Products."

### III. Plaintiff's Experience

50.   In late June 2015, Plaintiff was interested in purchasing an all-natural sleep aid. After reading an online article about Somnapure that, on information and belief, was prepared by Defendants, Plaintiff visited the Peak Life Website to obtain a free sample of Somnapure.

51.   During the process of ordering the free sample, Plaintiff saw the representations described above that Somnapure is a "natural" and "all natural" product. (*See supra* ¶¶ 13–18, 19, 20.) Using the Peak Life Website, Plaintiff provided his contact information and debit card information to Defendants. When he did so, he believed that he was ordering an all natural product containing only natural ingredients. In addition, he believed that he would be charged only for shipping and handling associated with obtaining a free sample of Somnapure.

52.   At no time did Defendants disclose to Plaintiff that Somnapure contains non-natural ingredients. Nor did Plaintiff notice any disclosure that he would be enrolled in the Subscription Program.

53.   On or about June 23, Defendants charged Plaintiff's debit card a total of $3.12 for shipping and handling and tax associated with the "free" sample that Plaintiff had ordered.

54.   Defendants automatically enrolled Plaintiff in the Subscription Program on or about 18 days after he ordered the free sample. On July 9, Defendants charged his debit card in the amount of $37.60 and sent him another bottle of Somnapure. Defendants did not provide any disclosures at the time they enrolled

him in the Subscription Program, nor did they provide him any disclosures immediately before or after it did so.

55.   In early July 2015, Plaintiff noticed the $37.60 transaction on his bank statement. The debit to his account caused his account to be overdrafted, and resulted in him having to pay overdraft fees. To pay other bills, Plaintiff had to take out a cash advance on his credit card. Although Plaintiff convinced his bank to refund the overdraft fees, he has not been refunded for the cash advance fees.

56.   Plaintiff called Defendants to complain about the charge and to request a full refund of all monies he had been charged. The representative of Defendants told Plaintiff that Defendants would not issue him a full refund. Plaintiff asked to speak to a supervisor, who told him the same thing.

57.   When Plaintiff called his bank about the charges, a bank representative offered to call Defendants to attempt to persuade them to reverse the charges. The bank representative subsequently informed Plaintiff that Defendants had once again refused to issue a full refund.

58.   Pursuant to Defendants' policy, consumers may receive a refund for the price of an unused bottle—but not the shipping and handling—if they return it to Defendants and pay the shipping costs to do so.

59.   After speaking with Plaintiff's bank representative, Defendants credited $37.60 to Plaintiff's debit card, and sent Plaintiff a "Return Merchandise Authorization" to return the bottle. Although Plaintiff has not opened the bottle or used the Somnapure product, Plaintiff has not returned the bottle, because he does not want to bear the additional expense of shipping. Accordingly, pursuant to Defendants' policy, Plaintiff still owes Defendants for the bottle, and is subject to being re-charged the $37.60 for its purported value. Defendants have never refunded the original $3.12 shipping charge, nor reimbursed Plaintiff for the cash advance charges imposed by Plaintiff's bank.

60.   Plaintiff would not have given Defendants his debit card information had he known that Somnapure was not an all-natural product. Nor would Plaintiff have given Defendants his debit card information had he known that they would use it to enroll him in the Subscription Program.

61.   Had Defendants complied with the terms of the Injunction and disclosed the Terms and Conditions at the time he was enrolled in the Subscription Program, Plaintiff would have declined to order the free sample or be enrolled in the Subscription Program.

## IV. Complaints of Similarly Situated Consumers

62.   Plaintiff's experience is not unique. Consumers have posted numerous complaints regarding Defendants' deceptive practices online. Many of these complaints were posted after Defendants told the Court that they had changed their practices. Below are some of the many examples of recent consumer complaints:





**max**
30 Nov 2014

I was also taken by the scam of needing the credit card for only shipping. I could not get an answer or email address from company. I filed a credit dispute with my credit card company and had them block all future billings to it. If they want to call me to talk about future billings it would NOT be in their best interest.

Reply   !

**Dee**
30 Jan 2015 | 1 reply

Same story here. I gave PeakLife my bank card info for the $2.99 sample and today noticed they charged me $34.98. I did NOT intend to keep on ordering this product. If I want to use it, I will buy it at WalMart. I am on hold with PeakLife as I am posting this comment. Wish me luck.

Reply   !

**ML**
24 Jun 2015

I was scammed too! Thought I was only paying $2.99 for a SAMPLE, but then now I was just hit with a $34.98 charge! I am going to dispute this transaction with my bank and I just made a complaint online with the FTC, at WWW.FTC.GOV. If enough people complain about this company, they will have to do something about their deceptive business practices.

Reply   !

**Miriam Walter**
3 Jul 2015

I have had them charge my account also with a monthly prescription after the trial came. Called them and told them to give me my monies back. We will see! after reading all these complaint i see that I am not the only one that this company has Dupp! i will do what i have to to get my monies back and that is call the Attorney General!

Reply   !

(http://complaintwire.org/complaint/vKUBAAAAAAA/peaklife/.)



## DON'T USE PEAK LIFE. THEY ARE A SCAM.

〈   **124 of 435**   〉
**Peak Life Reviews**

📍Marquette, Michigan    Feb 17    463 views    2 comments

I thought I was getting a "free sample" and of course it was only their deceptive way of getting my address and credit card number.I did not see ANYTHING that said I had to notify them in order to stop further shipments, and I got another package 2 weeks later and a bill for $35.00

The product is no good anyway.

When I called to complain and cancel he basically chided me, on the *** of taunting me. He said there would be no future shipments, but that I couldn't return this one and had to pay for it.

What a joke.I blame myself for falling for the "free sample" gimmick--never again.

(http://peak-life.pissedconsumer.com/don-t-use-peak-life-they-are-a-scam-20150217596624.html.)



I also had the same situation happen. The 14 day free trial is definitely misleading. They put just enough information on the website and hide it in the right places. They let you know you are entering a credit card for shipping & handling then sign you up as a VIP member 18 days later. Talked to a customer service rep and a manager and you can tell this happens all the time. They offer you 60% back on your card right away and try to get you to keep the product. If you keep pushing, you do have the option to send it back and get the full price of the bottle back but they do refuse to even meet you halfway on the shipping. You will end up eating at least $10 with the shipping both ways.

(http://www.complaintsboard.com/complaints/peak-life-somnapure-c493979.html). (*See also* http://www.pissedconsumer.com/product/somnapure-sleep-aid.html; http://www.ripoffreport.com/r/Somnapure-Peak-Life/internet/Somnapure-Peak-Life-Somnapure-Peak-Life-free-sample-scam-Internet-1132757.)

63.   Unless injunctive relief is granted by this Court, Defendants are likely to continue to injure Plaintiff and other similarly situated persons by engaging in the same false advertising, misrepresentations, unfair business practices and other misconduct described above. Defendants and their subsidiaries are a complex web of companies that sell products, including health supplements, under various brand names that are also marketed as being natural and/or "all-natural." These subsidiaries and brands include at least Force Factor, Stages of Beauty, ProbioSlim, and Femme Factor. Because Plaintiff continues to seek genuinely natural products, including genuinely natural health supplements, he is likely to be deceived by these representations of Defendants. Defendants are likely to continue to falsely market their products as "Natural" and "All Natural' and to continue to impose charges on Plaintiff and similarly situated persons as part of

the Subscription Program (including, in the case of Plaintiff, by re-imposing a charge of $37.20 for the bottle of Somnapure that he has not returned in light of Defendants' refusal to pay for return shipping) (*see supra*, ¶¶ 58–59).

**V.   Plaintiff Has Never Agreed to Arbitrate this Matter or to Waive His Right to Bring a Class Action Lawsuit.**

64.   The bottom of the Peak Life Website has a link entitled "[ TERMS ]." The link leads to a separate webpage entitled "Peak Life Program – Terms of Offer." The Terms of Offer states: "By placing an order through this website, you agree to the terms and conditions set forth below." The Terms of Offer contains an Arbitration provision, as well as a Waiver of Class Action Rights provision.

65.   The Terms of Offer is a "browsewrap" agreement. Consumers are never shown the Terms of Offer or its provisions unless they click on the "[ TERMS ]" link on the bottom of the Peak Life Website. Accordingly, consumers who order samples of Somnapure on the Peak Life Website are never shown the Terms of Offer or its provisions. Indeed, at no point during the ordering process does the Peak Life Website even refer to the Terms of Offer or its provisions, let alone require consumers to view or agree to those provisions as part of the ordering process.

66.   Plaintiff has never seen or agreed to the Terms of Offer or its provisions. Plaintiff has never agreed to arbitrate this matter, nor has he agreed to waive his right to bring a class action lawsuit with respect to this matter.

**VI.  Class Allegations**

67.   Plaintiff brings this action against Defendants, on behalf of himself and all others similarly situated, as a class action. Plaintiff seeks to represent the following groups of similarly situated persons:

> All persons who purchased or were charged for one or more purchases of Somnapure, in the United States, since September

23, 2011 (excluding persons who made their purchases directly
from Defendants via the Internet between April 1, 2009 and
March 13, 2013)[4] (the "Class");

All members of the Class who ordered or purchased Somnapure
directly from Defendants via the Internet. (the "Internet
Ordering Subclass");

All members of the Internet Ordering Subclass who were
enrolled in and charged for a subscription for Somnapure after
requesting a free sample on or after March 14, 2013 (the
"Subscription Subclass");

All members of the Subscription Subclass whose request for a
free sample was made on or after March 25, 2014 (the
"Injunction Subclass); and

All members of the Subscription Subclass for whom the charges
were paid by debit cards (the "Debit Card Subclass").

68.   The classes defined in the previous paragraph are hereinafter referred to
collectively as the "Classes."

69.   This action has been brought and may be properly maintained as a class
action against Defendants because there is a well-defined community of interest
in the litigation and each proposed class is easily ascertainable.

70.   Numerosity:  Plaintiff does not know the exact size of the Classes, but it
is estimated that they are each composed of more than 100 persons. The persons
in the Classes are so numerous that the joinder of all such persons is impracticable
and the disposition of their claims in a class action rather than in individual
actions will benefit the parties and the courts.

71.   Common Questions Predominate:  This action involves common
questions of law and fact to the potential Classes because each class member's

---

[4] The Class includes purchases both through the Internet and in brick-and-mortar
stores.  The purpose of the parenthetical exclusion is to eliminate persons whose
claims were released in the *Manna* case.

claim derives from the same: (i) deceptive, unlawful, unfair and/or false statements and omissions that led Defendants' consumers to believe that they were ordering or purchasing an "all-natural" product; (ii) deceptive, unlawful, unfair and/or false statements and omissions that led Defendants' consumers to believe that they were ordering a free sample of Somnapure, when they were in fact being enrolled in the Subscription Program; (iii) breach of the Settlement Agreement; and (iv) violation of this Court's Injunction. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover.  Among the questions of law and fact common to the Classes are:

- whether Defendants' representations that Somnapure is a "natural" and "all-natural" product were false;

- whether Defendants unlawfully and/or deceptively failed, and continue to fail, to inform class members that Somnapure is not a "natural" or "all natural" product;

- whether Defendants breached the Settlement Agreement's requirement that Defendants inform all consumers of all material terms associated with their Subscription Program "at the time a consumer enrolls into a Subscription Program;"

- whether Defendants breached the Settlement Agreement's requirement that Defendants "conspicuously" inform all consumers of all material terms associated with their Subscription Program;

- whether Defendants breached the Settlement Agreement and Injunction's requirement that Defendants "clearly" inform all consumers of all material terms associated with their Subscription Program;

- the amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing; and

- whether class members are entitled to payment of actual, incidental, consequential, and/or punitive damages plus interest thereon, and if so, what is the nature of such relief.

72.   <u>Typicality</u>:   Plaintiff's claims are typical of the Class because Plaintiff was charged for the purchase of Somnapure in the United States on or after March 14, 2013. Plaintiff's claims are typical of the Internet Ordering Subclass because he ordered Somnapure directly from Defendants via the Internet. Plaintiff's claims are also typical of the Subscription Subclass because he was enrolled in and charged for a subscription for Somnapure after requesting a free sample from Defendants on the Internet on or after March 14, 2013. Plaintiff's claims are typical of the Injunction Subclass because his request for a free sample was made after March 25, 2014. Finally, Plaintiff's claims are typical of the Debit Card Subclass because his debit card was charged by Defendants for a subscription to Somnapure. Thus, Plaintiff and members of the Classes sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each member of the Classes were caused directly by Defendants' wrongful conduct in violation of law as alleged.

73.   <u>Adequacy</u>:   Plaintiff will fairly and adequately protect the interests of all class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains.  Plaintiff also has no interests that are in conflict with or antagonistic to the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and that of the Classes. By prevailing on his own claim, Plaintiff will establish Defendants' liability to all class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

74.   <u>Superiority</u>:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

75.   <u>Nexus to Massachusetts</u>.  The State of Massachusetts has a special interest in regulating the affairs of corporations that do business here. Defendants have their principal place of business in Massachusetts, and the acts complained of herein emanated from decisions made by Defendants in Massachusetts. Accordingly, there is a substantial nexus between Defendants' unlawful behavior and Massachusetts such that courts located in Massachusetts should take cognizance of this action on behalf of classes of individuals who reside anywhere in the United States.

76.   <u>Massachusetts law</u>.  Defendants have elected to apply Massachusetts law to all disputes between it and their customers. The Settlement Agreement also specifies that it shall be interpreted according to Massachusetts law. In addition, on information and belief, all aspects of Defendants' business are controlled from their principal place of business in Massachusetts. Further, on information and belief, the actions of Defendants complained of herein were made in from

Defendants' principal place of business in Massachusetts, including (i) the
creation of the Somnapure package and other marketing materials; (ii) the
development, design, and maintenance of the Peak Life Website; (iii) the planning
and implementation of the Subscription Program; (iv) the decision to violate the
Court's injunction; and (v) the initiation of all charges to members of the Internet
Ordering Subclass.

77.   Plaintiff is unaware of any difficulties that are likely to be encountered
in the management of this action that would preclude its maintenance as a class
action.

### Count I: Breach of Express Warranty
### (On Behalf of Plaintiff and the Class)

78.   Plaintiff realleges and incorporates the above paragraphs of this
Complaint as if fully set forth herein.

79.   Under Massachusetts law, any affirmation of fact or promise made by
the seller or manufacturer to the buyer which relates to the goods and becomes
part of the basis of the bargain creates an express warranty that the goods shall
conform to the affirmation or promise.

80.   Under Massachussets law, any description of the goods which is made
part of the basis of the bargain creates an express warranty that the goods shall
conform to the description.

81.   Defendants' representations to Plaintiff, and those similarly situated,
that Somnapure is a "natural" and "all natural" supplement were affirmations or
promises that related to Somnapure and became part of the basis of the bargain
between Defendants, and Plaintiff and those similarly situated, thereby creating an
express warranty.

82.   Defendants' description of Somnapure as being a "natural" and "all
natural" supplement was made part of the basis of the bargain between

Defendants, and Plaintiff and those similarly situated, thereby creating an express warranty.

83.   Defendants breached these express warranties because Defendants' affirmations, promises, representations, and descriptions of Somnapure as being "natural" and "all natural" were false. Somnapure is not a "natural" or "all natural" product because it contains synthetic, non-natural ingredients.

84.   Defendants' false affirmations, promises, and descriptions of Somnapure were made knowingly and intentionally.

85.   Defendants' breach of their express warranties damaged Plaintiff and those similarly situated. Were it not for Defendants' false affirmations, promises, and descriptions of Somnapure, Plaintiff and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less for) Somnapure, the Subscription Program, and/or shipping and handling to receive a Somnapure sample.

**Count II: Breach of Implied Warranty of Merchantability**
**(On Behalf of Plaintiff and the Class)**

86.   Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

87.   Under Massachusetts law, a warranty that goods are merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. The warranty of merchantability extends to the end user (i.e., the consumer) of the products.

88.   Because Defendants are merchants with respect to supplements such as Somnapure, both directly to consumers and to resellers who in turn sell the product to consumers, a warranty of merchantability is implied in contracts for the sale of Somnapure.

89.   Under Massachusetts law, merchantable goods must be adequately contained, packaged, and labeled as the agreement may require; and must also conform to the promises or affirmations of fact made on the container or label. Mass. Gen. Laws Ann. ch. 106, § 2-314(e) and (f).

90.   The Somnapure supplement was not adequately contained, packaged, or labeled as the agreements for its sale to Plaintiff and those similarly situated required. In particular, the agreements required that Somnapure be "natural" and "all natural," but Somnapure is not "natural" or "all natural" because it contains synthetic, non-natural ingredients.

91.   The Somnapure supplement did not conform to the promises or affirmations of fact made on the container or label. In particular, the Somnapure promised and affirmed that Somnapure was a "natural" sleep aid, when in fact Somnapure is not "natural" because it contains synthetic, non-natural ingredients.

92.   Defendants knowingly and intentionally failed to ensure that the Somnapure product was adequately contained, packaged, or labeled as the agreement for sale required, and further failed to ensure that the Somnapure product conformed to the promises or affirmations of fact made on the container or label.

93.   Defendants' breach of their implied warranties damaged Plaintiff and those similarly situated. Were it not for Defendants' failure to adequately contain, package, and label Somnapure, Plaintiff and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less for) Somnapure and/or shipping and handling to receive Somnapure. Similarly, were it not for Defendants' failure to conform to the promises or affirmations of fact made on the Somnapure container or label, Plaintiff and those similarly situated would have acted differently by, without limitation, not purchasing (or paying less

for) Somnapure, the Subscription Program, and/or shipping and handling to receive Somnapure.

### Count III: Breach of Contract
### (On Behalf of Plaintiff and the Internet Ordering Subclass)

94.   Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

95.   In or around June 2015, Plaintiff entered into a written (online) contract with Defendants to obtain a "natural" and "all natural" product. These representations were material terms to the contracts entered into between Defendants, and Plaintiff and those similarly situated.

96.   Defendants breached the contracts by providing to Plaintiff, and those similarly situated, Somnapure that was not "natural" or "all natural," and that contained synthetic, non-natural ingredients.

97.   As a direct and proximate result of the breaches set forth herein, Plaintiff and those similarly situated have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

### Count IV: Breach of Contract
### (On Behalf of Plaintiff and the Injunction Subclass)

98.   Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

99.   Plaintiff and those similarly situated are third party beneficiaries to the December 2013 Amended Class Action Settlement Agreement, filed on December 9, 2013 in *Manna et al. v Hungry Fish Media LLC*, et al. (Case No. 3:13-cv-30166-KPN), Dkt. No. 23 (the "Settlement Agreement"). In particular, Plaintiff and those similarly situated are third party beneficiaries to the injunction set forth in Paragraph 5.6 of the Settlement Agreement (the "Injunction"), which

was adopted by the Court pursuant to the Court's March 25, 2014 Order Granting Final Approval of Class Action Settlement. (*See Manna* at Dkt. No. 32.)

100.  Pursuant to the Settlement Agreement and the Injunction, Defendants agreed to, and were subsequently ordered to, "at the time a consumer enrolls into a Subscription Program, clearly and conspicuously inform all consumers of all material terms and conditions associated with the Subscription Program."

101.  Defendants breached the Settlement Agreement, and violated this Court's Injunction, by failing to inform Plaintiff and those similarly situated of the material terms and conditions associated with the Subscription Program "at the time a consumer enrolls into a Subscription Program." Plaintiff was enrolled into Defendants' subscription program in or around July 9, 2015, and Defendants failed to provide him with ***any*** terms and conditions associated with the Subscription Program—let alone "all material terms and conditions"—on or about that date.

102.  Defendants breached the Settlement Agreement, and violated this Court's Injunction, by failing to "conspicuously" inform Plaintiff and those similarly situated of all material terms and conditions associated with the Subscription Program. In fact, Defendants took steps to ensure the terms and conditions were displayed ***inconspicuously*** to Plaintiff and those similarly situated. In particular, Defendants chose to display the terms and conditions in the bottom corner of the webpage, and in a font that is much smaller and more difficult to read than any other font used throughout the entire checkout process, and without any language or checkbox asking Plaintiff or those similarly situated to agree to the terms.

103.  Defendants breached the Settlement Agreement, and violated this Court's Injunction, by failing to "clearly" inform Plaintiff and those similarly situated of all material terms and conditions associated with the Subscription

Program. In fact, Defendants took steps to ensure that the terms were unclear and confusing to Plaintiff and those similarly situated. In particular, during the checkout process, Defendants informed Plaintiff and those similarly situated that they were signing up for a "FREE SAMPLE, PAY ONLY SHIPPING AND HANDLING." In addition, on the webpage on which Defendants collected consumers' credit or debit card information, Defendants repeatedly implied that Plaintiff and those similarly situated were paying for *only* shipping and handling. At the top of the webpage, text in a large font stated "Pay For S & H Below." The webpage also included a box containing a form for credit or debit card information, and the box was entitled "Shipping & Handling." Further, the webpage contained a breakdown of price that includes "S&H" for "$2.99," and stated that the "Total" is "$2.99." Plaintiff and those similarly situated saw all of these representations and/or substantively identical representations. These representation, and the manner in which they were displayed, led Plaintiff and those similarly situated to reasonably believe that they were providing their payment information to pay for shipping and handling only, when in fact the payment information was actually used to charge consumers on a recurring basis.

104.  As a direct and proximate result of the breaches set forth herein, Plaintiff, and those similarly situated, have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

### Count V: Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Internet Ordering Subclass)

105.  Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

106. Under Massachusetts law, the sales agreement entered into between Defendants, and Plaintiff and those similarly situated, included an implied covenant of good faith and fair dealing.

107. Because Defendants had represented that Somnapure was a "natural" and "all natural" product, Plaintiff and those similarly situated reasonably expected that Somnapure was a "natural" and "all natural" product.

108. Defendants breached the covenant of good faith and fair dealing by knowingly and intentionally, and in bad faith, providing to Plaintiff and those similarly situated a supplement that was not "natural" or "all-natural," and that contained synthetic, non-natural ingredients, thereby violating the reasonable expectations of Plaintiff and those similarly situated.

109. As a direct and proximate result of the breaches set forth herein, Plaintiff and those similarly situated have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

## Count VI: Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Injunction Subclass)

110. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

111. Under Massachusetts law, the Settlement Agreement included an implied covenant of good faith and fair dealing.

112. Plaintiff and those similarly situated are third-party beneficiaries to the Settlement Agreement.

113. The Settlement Agreement required Defendants to, "at the time a consumer enrolls into a Subscription Program, clearly and conspicuously inform all consumers of all material terms and conditions associated with the Subscription Program."

114. For the reasons set forth above, (*supra* ¶¶ 45–49), Defendants failed to act in good faith to fulfill the terms of the Settlement Agreement.

115. By failing to act in good faith to fulfill the terms of the Settlement Agreement, Defendants destroyed and/or injured the right of Plaintiff and those similarly situated to receive the benefits of the Settlement Agreement.

116. As a direct and proximate result of the bad faith conduct set forth herein, Plaintiff and those similarly situated have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

### Count VII: Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Subscription Subclass)

117. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

118. Defendants, and Plaintiff and those similarly situated, entered into a contract whereby Plaintiff and those similarly situated would obtain a sample of Somnapure. This contract included an implied covenant of good faith and fair dealing.

119. As part of the contract, Plaintiff and those similarly situated agreed to provide their payment information to Defendants in exchange for Somnapure's agreement to provide Plaintiff and those similarly situated with a free sample of Somnapure and to charge them for nothing more than shipping and handling. In particular, Defendants agreed to provide a "FREE SAMPLE, PAY ONLY SHIPPING AND HANDLING." In addition, on the webpage on which Defendants collected consumers' credit card information, Defendants repeatedly represented that Plaintiff and those similarly situated were paying for ***only*** shipping and handling. At the top of the page, text in a large font stated "Pay For S & H Below." The page also included a box containing a form for credit card

information, and the box was entitled "Shipping & Handling." Further, the page contained a breakdown of price that includes "S&H" for "$2.99," and stated that the "Total" is "$2.99." Plaintiff and those similarly situated saw all of these representations and/or substantively identical representations.

120. Defendants breached the covenant of good faith and fair dealing by knowingly and intentionally, and in bad faith, enrolling Plaintiff and those similarly situated in the Subscription Program, and charging Plaintiff and those similarly situated for additional bottles of of Somnapure, together with shipping and handling.

121. As a direct and proximate result of the breaches set forth herein, Plaintiff and those similarly situated have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

**Count VIII: Fraud**
**(On Behalf of Plaintiff and the Class)**

122. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

123. Defendants made false representations to Plaintiff and those similarly situated. In particular, Defendants falsely represented that Somnapure is a "natural" and "all natural" product.

124. The representations that Somnapure was a "natural" and "all natural" product were material to the agreement of Plaintiff and those similarly situated to obtain Somnapure. Had Plaintiff and those similarly situated known that Somnapure is not a "natural" or "all natural" product, they would have acted differently by, without limitation, not purchasing (or paying less for) Somnapure and/or shipping and handling to receive Somnapure.

125. Defendants knew that their representations that Somnapure was a "natural" and "all natural" product were false at the time it made them. In particular, Defendants knew that Somnapure contained non-natural, synthetic ingredients. Defendants know the precise ingredients that are contained in Somnapure, because Somnapure is manufactured by Defendants or at their direction.

126. Defendants knowingly made these false representations to Plaintiff and those similarly situated for the purpose of inducing them to purchase or order Somnapure.

127. Plaintiff and those similarly situated reasonably relied on Defendants' false representations, and acted upon them by purchasing or ordering Somnapure.

128. As a result of their reliance on Defendants' false representations, Plaintiff and those similarly situated have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

## Count IX: Fraud
### (On Behalf of Plaintiff and the Subscription Subclass)

129. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

130. Defendants made false representations to Plaintiff and those similarly situated. In particular, Defendants falsely represented to Plaintiff, and those similarly situated, that they would provide them with a "FREE SAMPLE, PAY ONLY SHIPPING AND HANDLING." In addition, on the webpage on which Defendants collected consumers' payment information, Defendants falsely represented that Plaintiff and those similarly situated were paying for *only* shipping and handling. At the top of the webpage, text in a large font stated "Pay For S & H Below." The webpage also included a box containing a form for

payment information, and the box was entitled "Shipping & Handling." Further,
the webpage contained a breakdown of price that includes "S&H" for "$2.99,"
and stated that the "Total" is "$2.99." Plaintiff and those similarly situated saw all
of these representations and/or substantively identical representations.

131.  These representations were material to the agreement of Plaintiff and
those similarly situated to obtain Somnapure. Had Plaintiff and those similarly
situated known that Defendants would charge their credit cards or debit cards for
anything other than shipping and handling of the initial sample of Somnapure,
Plaintiff and those similarly situated would not have provided their payment
information to Defendants.

132.  Defendants knew that these representations were false at the time they
made them. In particular, Defendants knew that they would use the payment
information provided by Plaintiff and those similarly situated to change them for
more than just shipping and handling; Defendants knew that they would use the
payment information to charge Plaintiff and those similarly situated for charges
associated with the Subscription Program.

133.  Defendants knowingly made these false representations to Plaintiff and
those similarly situated for the purpose of inducing them to provide their payment
information to Defendants.

134.  Plaintiff and those similarly situated reasonably relied on Defendants'
false representations, and acted upon them by providing their payment
information to Defendants.

135.  As a result of their reliance on Defendants' false representations,
Plaintiff and those similarly situated have suffered, and continue to suffer,
damages in an amount which will be proven at trial, but which are in excess of the
jurisdictional minimum of this Court.

**Count X: Negligent Misrepresentation**
**(On Behalf of Plaintiff and the Class)**

136.  Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

137.  Defendants falsely represented to Plaintiff and those similarly situated that Somnapure is a "natural" and "all natural" product.

138.  Whether or not Somnapure was a "natural" and "all natural" product was material to the agreement of Plaintiff and those similarly situated to obtain Somnapure. Had Plaintiff and those similarly situated known that Somnapure is not a "natural" or "all natural" product, they would have acted differently by, without limitation, not purchasing (or paying less for) Somnapure and/or shipping and handling to receive Somnapure.

139.  Plaintiff and those similarly situated were unaware of the falsity of Somnapure's representations, and justifiably relied on them in purchasing Somnapure and/or paying shipping and handling to receive Somnapure.

140.  Due to their justifiable reliance on Somnapure's representations, Plaintiff and those similarly situated suffered pecuniary loss.

**Count XI: Negligent Misrepresentation**
**(On Behalf of Plaintiff and the Subscription Subclass)**

141.  Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

142.  Defendants falsely represented to Plaintiff and those similarly situated that they would provide them with a "FREE SAMPLE, PAY ONLY SHIPPING AND HANDLING." In addition, on the webpage on which Defendants collected consumers' payment information, Defendants falsely represented that Plaintiff and those similarly situated were paying for ***only*** shipping and handling. At the top of the webpage, text in a large font stated "Pay For S & H Below." The webpage also included a box containing a form for payment information, and the

box was entitled "Shipping & Handling." Further, the webpage contained a breakdown of price that includes "S&H" for "$2.99," and stated that the "Total" is "$2.99." Plaintiff and those similarly situated saw all of these representations and/or substantively identical representations.

143.  These representations were material to the agreement of Plaintiff and those similarly situated to obtain Somnapure. Had Plaintiff and those similarly situated known that Defendants would charge their credit cards or debit cards for anything other than shipping and handling of the initial sample of Somnapure, Plaintiff and those similarly situated would not have provided their payment information to Defendants.

144.  Plaintiff and those similarly situated were unaware of the falsity of Somnapure's representations, and justifiably relied on them in purchasing Somnapure and/or paying shipping and handling to receive Somnapure.

145.  Due to their justifiable reliance on Somnapure's representations, Plaintiff and those similarly situated suffered pecuniary loss.

## Count XII: Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

146.  Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

147.  As a result of Defendants' unlawful and deceptive actions with respect to Peak Life's "natural" and "all natural" representations described above, Defendants were enriched at the expense of Plaintiff and those similarly situated through their payment of monies to obtain Somnapure.

148.  Under the circumstances, it would be contrary to equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and those similarly situated.

149. By reason of the foregoing, Plaintiff and those similarly situated were damaged in the amount they paid to obtain the Somnapure product.

### Count XIII: Unjust Enrichment
### (On Behalf of Plaintiff and the Subscription Subclass)

150. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

151. As a result of Defendants' unlawful and deceptive actions with respect to Defendants' representations that Plaintiff and those similarly situated would be charged for only shipping and handling, Defendants were enriched at the expense of Plaintiff and those similarly situated through their payment of monies to obtain Somnapure.

152. Under the circumstances, it would be contrary to equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiff and those similarly situated.

153. By reason of the foregoing, Plaintiff and those similarly situated were damaged in the amount they paid to obtain the Somnapure product.

### Count XIV: Violation of the Electronic Funds Transfer Act,
### 15 U.S.C. § 1693, *et seq.*
### (On Behalf of Plaintiff and the Debit Card Subclass)

154. Plaintiff realleges and incorporates the above paragraphs of this Complaint as if fully set forth herein.

155. Defendants initiated, and continue to initiate, electronic fund transfers from the accounts of Plaintiff and those similarly situated, on a recurring basis, at substantially regular intervals, for the purposes of charging them for the Somnapure sent through the Subscription Program (the "Electronic Transfers").

156. Defendants initiated, and continue to initiate, the Electronic Transfers, without obtaining written authorization or providing them with a copy of such purported authorization, in violation of 15 U.S.C. § 1693e(a). Pursuant to 12

C.F.R. 205.4, such disclosures "must be in a clear and readily understandable written form that the consumer may retain." As set forth above, Defendants' disclosure of the Subscription Program is not made in a clear or readily understandable form.

157.  Defendants initiated, and continue to initiate, the Electronic Transfers without disclosing, to Plaintiff or those similarly situated, the liability of Plaintiff or those similarly situated for unauthorized electronic fund transfers, in violation of 15 U.S.C. § 1693c(a)(1).

158.  Defendants initiated, and continue to initiate, the Electronic Transfers without disclosing, to Plaintiff or those similarly situated, the telephone number and address of the person or office to be notified in the event that Plaintiff or those similarly situated believed that an unauthorized electronic fund transfer has been or may be effected, in violation of 15 U.S.C. § 1693c(a)(2).

159.  Defendants initiated, and continue to initiate, the Electronic Transfers without first disclosing, to Plaintiff or those similarly situated, the right of Plaintiff and those similarly situated to stop payment of a preauthorized electronic fund transfer and the procedure to initiate such a stop payment order, in violation of 15 U.S.C. § 1693c(a)(5).

160.  Defendants initiated, and continue to initiate, the Electronic Transfers without first disclosing, to Plaintiff or those similarly situated, the right of Plaintiff and those similarly situated to receive documentation of the Electronic Transfers, in violation of 15 U.S.C. § 1693c(a)(6).

161.  Defendants initiated, and continue to initiate, the Electronic Transfers without first disclosing, to Plaintiff or those similarly situated, a summary of the error resolution provisions of 15 U.S.C. § 1693f, in violation of 15 U.S.C. § 1693c(a)(7).

162.  Defendants initiated, and continue to initiate, preauthorized electronic fund transfers from the accounts of Plaintiff and those similarly situated without, prior to the transfers, providing advance notice to Plaintiff and those similarly situated, of the amount to be transferred and the scheduled date of the transfer, in violation of 15 U.S.C. § 1693e(b).

163.  Defendants did not and do not engage in reasonable procedures to determine whether a debit card was or is being used to pay for the shipping and handling of the free sample, and thus whether the charges for the Subscription Program are or will be imposed on a demand deposit, savings deposit, or other asset account as defined in 15 U.S.C. § 1693a(2). Among other things, Defendants do not engage in any interaction with the consumer to elicit information as to whether a debit card is being used. Although they had the right to do so, Defendants also have not instructed their merchant processor to block transactions to debit cards. Defendants also have failed to consult (or to ask their merchant processor to consult) Bank Identification Number (BIN) tables to distinguish between debit cards and credit cards, even though such tables are available online and updated at least weekly, and even though Defendants had approximately eighteen days to do so after receiving the debit card from consumers and before imposing the first charge for the Subscription Program.

164.  On information and belief, Defendants have been made aware by their merchant processor as to the volume and amount of transactions processed to debit cards.  Thus, their misconduct as described in paragraphs 155 to 163 was knowing and intentional.

165.  The actions described in paragraphs 155 to 163 also violate the implementing regulations for the Electronic Fund Transfer Act, 12 C.F.R. § 205.1 *et seq.*

166. Plaintiff and those similarly situated have suffered damages by reason of Defendants' violations set forth herein.

**Reservation of Rights to Bring Claims Pursuant to Mass. Gen. L. c. 93A**

167. Pursuant to Mass. Gen. L. c. 93 § 9(3), Plaintiff is providing a written demand to Defendants reasonably describing their unfair and deceptive acts and practices, and the injuries suffered.

168. Plaintiff reserves his right to amend this Complaint to state claims under Mass. Gen. L. c. 93A, no earlier than thirty days following the mailing or delivery of the written demand to Defendants.

**Request for Relief**

Plaintiff seeks, on behalf of himself and the Classes, the following relief from Defendants:

**With respect to Counts I-IV and IX-XII:**

a)   an award of damages adequate to compensate Plaintiff, and those similarly situated, for their losses, together with prejudgment and post-judgment interest and costs, in an amount according to proof; and

b)   such other relief as the Court may deem just and proper.

**With respect to Counts V, VI, and VII (Breach of the Covenant of Good Faith and Fair Dealing):**

a)   an award of damages adequate to compensate Plaintiff, and those similarly situated, for their losses, together with prejudgment and post-judgment interest and costs, in an amount according to proof;

b)   punitive damages; and

c)   such other relief as the Court may deem just and proper.

**With respect to Counts VIII and IX (Fraud):**

a)   an award of damages adequate to compensate Plaintiff, and those similarly situated, for their losses, together with prejudgment and post-judgment interest and costs, in an amount according to proof;

b)   punitive damages; and

c)   such other relief as the Court may deem just and proper.

**With respect to Count XIII (Violation of the Electronic Funds Transfer Act):**

a)   an award of damages adequate to compensate Plaintiff, and those similarly situated, for their losses, together with prejudgment and post-judgment interest and costs, in an amount according to proof;

b)   statutory damages;

c)   attorneys' fees; and

d)   an injunction against further violations.

### Demand for Jury Trial

Plaintiff respectfully requests a trial by jury.

Dated: September 25, 2015          Respectfully submitted,

 /Marie McCrary            /
Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Todd Kennedy, Esq.
Marie McCrary, Esq. (BBO 686707)
Gutride Safier, LLP
100 Pine St., Suite 1250
San Francisco, California 94111
Telephone: (415) 529-4995
Facsimile: (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
todd@gutridesafier.com

marie@gutridesafier.com

Attorneys for Plaintiff